**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**TERESA PEDREGON**

**Plaintiff,**

**v.**

**CHAD WOLF, ACTING SECRETARY,**
**UNITED STATES DEPARTMENT OF**
**HOMELAND SECURITY**

**Defendant.**

**CIVIL NO.  2:20-CV-512**

## COMPLAINT

Plaintiff Teresa Pedregon asserts her causes of action against defendant Chad Wolf, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security, regarding the unlawful employment actions of its agency, the United States Customs and Border Protection, as follows:

### THE PARTIES

1.     Plaintiff is Teresa Pedregon, a person of majority, currently domiciled in Louisiana.

2.     Defendant is Chad Wolf, solely in his official capacity, the Acting Secretary of the Department of Homeland Security (DHS), including its agency, United States Customs and Border Protection (CBP) (*see* 6 U.S.C. § 112(a) establishing the Secretary of DHS as the head of the department *and also* 6 U.S.C. § 211(e) establishing U.S. CBP).

### JURISDICTION AND VENUE

3.     The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. § 2000e-2 *et seq*. (Title VII disparate treatment/impact); 42 U.S.C. § 2000e-3 *et seq*. (Title VII retaliation); and 42 U.S.C. § 2000e-16 (applicability of Title VII to federal employment) as more particularly set-out herein.

1

4.      The Court has personal jurisdiction over Mr. Wolf, in his official capacity and as the proper defendant representing the United States Department of Homeland Security (and its agency, U.S. Customs and Border Protection), because all of the unlawful employment practices alleged herein occurred in the state of Louisiana (or were directed towards an employee working in Louisiana) and give rise to the specific Title VII causes of action in this case, and thus Mr. Wolf, in his official capacity and as the proper defendant for DHS and CBP, has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

5.      Venue for Ms. Pedregon's Title VII claim is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically New Orleans), or were directed against Ms. Pedregon who was working in this forum (specifically New Orleans), or alternatively because Ms. Pedregon would have continued to have been employed in her otherwise promoted position in this forum but for the his discriminatory non-selection at issue in this case.

## PROCEDURAL AND STATUTORY ALLEGATIONS

6.      At all relevant times, CBP employed more than 500 employees.

7.      In December 2003, CBP hired Ms. Pedregon (female, brown color, Hispanic) as a United States Border Patrol agent.

8.      Ms. Pedregon has been continuously employed by CBP since that time and assigned to the Office of the United States Border Patrol ("USBP").

9.      On or about September 11, 2018, Ms. Pedregon timely applied for the position of Associate Chief at USBP Headquarters in Washington, D.C. via USAjobs.gov posting USBP-IMP-

10288672-JRB.

10.     Ms. Pedregon first learned she was not selected for the position on November 30, 2018.

11.     Ms. Pedregon timely initiated EEO contact alleging sex, color, and national origin disparate treatment and disparate impact discrimination on or about January 14, 2019.

12.     Ms. Pedregon received her Notice of Right to File a charge of discrimination in this matter on or about April 10, 2019.

13.     Ms. Pedregon timely filed her initial Individual Complaint of Employment Discrimination in this matter on or about April 24, 2019 (Agency No. HS-CBP-00701-2019), alleging disparate treatment and impact based on her sex (female), color (brown), and national origin (Hispanic ethnicity).[1]

14.     Thereafter, Ms. Pedregon timely added the following like or related claims to her initial complaint as follows:

    a.     On May 17, 2019, Ms. Pedregon learned she was not selected for the position of Deputy Chief Patrol Agent, GS-1896-15, New Orleans, LA, advertised under Job Opportunity Announcement: USBP-IMP-10386844-CJH.   Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No.   HS-CBP-00701-2019), and USBP thereafter accepted that claim for

---

[1] Throughout this complaint, references are made to USBP employees and decision-makers who are "white and non-Hispanic" versus those who are "non-white and Hispanic."   This is done within the technical context of Title VII to distinguish a claim of discrimination based on race versus one based on ethnicity, color, and national origin.   To be clear, Ms. Pedregon considers her race to be white, although her skin is brown in color, while her ethnic national origin characteristic is Hispanic.   In a non-technical sense, the disparate treatment and impact ultimately complained of in this lawsuit, and throughout the underlying EEO proceeding, is that USBP favors men over women, and white or white-skinned employees over non-white (i.e., race) or non-white-skinned (i.e. color and national origin) employees.

investigation.

b.     On June 11, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about July 25, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No.  HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

c.     On July 18, 2019, Ms. Pedregon was demoted as a result of being reassigned to the position of Division Chief of Operational Programs at New Orleans Sector.  Ms. Pedregon timely filed an amendment to her initial complaint on or about July 25, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

d.     On July 26, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.  Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

e.     On August 23, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No.  HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

f.     On September 3, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP-10532623-HH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about October 18, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

g.     On October 1, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.  Ms. Pedregon timely filed an amendment to her initial complaint on or about October 18, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that

claim for investigation.

h.      On October 15, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.  Ms. Pedregon timely filed an amendment to her initial complaint on or about November 29, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

i.       On October 25, 2019, Ms. Pedregon learned that her request for a lateral transfer to the position of Patrol Agent in Charge, GS-1896- 14, Sonoita, AZ, was denied.  Ms. Pedregon timely filed an amendment to her initial complaint on or about November 29, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

j.       On December 9, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.  Ms. Pedregon timely filed an amendment to her initial complaint on or about January 23, 2020 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019).  Thereafter, USBP

6

declined to accept the amendment for investigation (but instead construed Ms. Pedregon's January 23 correspondence as initiating informal EEO contact regarding that claim).

15.     The date that Ms. Pedregon filed her initial charge of discrimination in this case was April 24, 2019.

16.     To date, CBP has not rendered a final decision in Ms. Pedregon's case.

17.     To date, CBP has not finished its investigation into Ms. Pedregon's initial complaint or any of her subsequent and accepted amendments.

18.     To date, Ms. Pedregon has at all times fully and reasonably cooperated with CBP's investigation into and potential resolution of her complaint and subsequent amendments as follows:

    a.     On or about April 24, 2019, Ms. Pedregon voluntarily submitted a signed, federal declaration setting out the specific facts and circumstances of the allegations in her initial complaint.

    b.     On August 5, 2019, Ms. Pedregon timely submitted full responses, under oath, to 38 interrogatories propounded by the EEO investigator assigned to investigate Ms. Pedregon's case.

    c.     On September 26, 2019, Ms. Pedregon voluntarily participated in an EEO refereed mediation with decision-makers from USBP to resolve the entirety of her initial complaint and all subsequent amendments.

    d.     The mediation was not successful, and the parties did not resolve their dispute.

    e.     On July 25, 2019; August 27, 2019; October 18, 2019; November 11, 2019; and January 23, 2020, Ms. Pedregon voluntarily submitted correspondence to CBP fully

setting out the facts and circumstances of each of her subsequent and accepted amendments to her initial charge.

19.     Nevertheless, to the best of Ms. Pedregon's observations, it appears that CBP took no further steps investigating her claims from July 17, 2019 (when CBP propounded 38 interrogatories to Ms. Pedregon relating to the facts of her case, which Ms. Pedregon timely answered on August 5, 2019) until January 13, 2020 (when CBP tendered Ms. Pedregon an additional 101 interrogatories in this matter relating to the facts and circumstances of her complaint previously and voluntarily submitted to CBP as described above).

20.     The total time during this period that it appears that CBP took no particular actions to the best of Ms. Pedregon's observation was 180 days.

21.     It has been more than 180 days – and, specifically, approximately 294 days – since Ms. Pedregon filed her initial complaint of discrimination in this matter through the date of filing of this federal lawsuit.

22.     At present, Ms. Pedregon has no reasonable hope that CBP will finish its investigation into Ms. Pedregon's complaint in any reasonable time period.

23.     At present, Ms. Pedregon is scheduled to transfer away from her current posting at USBP's New Orleans Sector in New Orleans, Louisiana.

24.     At present, Ms. Pedregon's understanding is that key witnesses currently assigned to USBP's New Orleans Sector in New Orleans, Louisiana are or will be scheduled for re-assignment away from New Orleans.

25.     Despite Ms. Pedregon's full and voluntary cooperation with CBP during its attempts to investigate and resolve Ms. Pedregon's complaint, CBP has not yet finished its investigation or rendered a final agency decision in the matter.

26.    Ms. Pedregon has fully exhausted her administrative claims over each instance of discrimination and retaliation alleged throughout this lawsuit, and Ms. Pedregon desires to commence federal litigation in this matter to hopefully preserve relevant evidence in this case and while witness memories are still fresh.

27.    For all these reasons, Ms. Pedregon is aggrieved by CBP's failure to take final action on her complaint in this matter.

28.    Accordingly, pursuant to 42 USC § 2000e-16(c) and 29 CFR § 1614.407(b), Ms. Pedregon now files this federal complaint arising from her initial complaint and subsequent amendments in this matter.

## FACTS

### A.    The Plaintiff – Teresa Pedregon

29.    Teresa Pedregon is a 47-year-old woman, who is brown in color, and who is ethnically Hispanic.

30.    Ms. Pedregon is married to her spouse, who is also a USBP agent, although Ms. Pedregon and her wife are currently forced to live separate and apart on different assignments within the United States specifically because of the unlawful employment actions alleged in this lawsuit.

31.    Ms. Pedregon began her full-time career as a United States Border Patrol Agent in 2003.

32.    Through excellent work and dedication to service, Ms. Pedregon earned multiple promotions within the USBP and currently holds the permanent rank of Division Chief, GS-14-1896, assigned to USBP's New Orleans Sector headquarters located in New Orleans, Louisiana.

33.    At one time, through her hard work and dedication, Ms. Pedregon served as the acting Deputy Chief Patrol Agent of a USBP's New Orleans Sector.

34.    Currently, Ms. Pedregon has been selected for transfer to the position of Patrol Agent in

Charge (GS-14-1896) of Blythe Station, located in Blythe, California, part of Yuma Sector, effective on April 26, 2020.

**B.     The Employing Agency – U.S. Customs and Border Protection, Office of United States Border Patrol**

35.     As a USBP agent, Ms. Pedregon is employed by United States Customs and Border Protection (CBP) and assigned to its Office of the United States Border Patrol.

36.     CBP is a statutory agency of the United States Department of Homeland Security.

37.     USBP is a statutory office of the CBP.

38.     At all relevant times, CBP employed more than 500 employees.

39.     USBP's statutory mission is to serve as the law enforcement office of CBP, and to interdict persons illegally entering or exiting the United States; interdict illegally imported or exported goods at points other than ports of entry; and deter and prevent the entry of terrorists, terrorist weapons, and other contraband.

**C.     USBP's Organizational and Leadership Structure**

40.     USBP's national headquarters is located in Washington D.C.

41.     USBP is geographically organized into "sectors," and each sector often cover multiple U.S. states, large linear stretches of the United States international border, and very large sections of United States territory.

42.     Each sector maintains its own leadership and support staff which provide leadership, supervision, and mission support throughout the region.

43.     The chief decision-maker with respect to all agency and personnel decisions at the sector-level is the Chief Patrol Agent (CPA).

44.     The executive officer who assists the CPA is the Deputy Chief Patrol Agent (DCPA).

45.     Typically, leadership at the sector-level then consists of different divisions, such as

"division of law enforcement operations," or "division of operational support," and is headed-up by a Supervisory Border Patrol Agent, often referred to as a "Division Chief."

46.     Thus, leadership and command structure at the sector-level, and specifically the New Orleans Sector, often looks like this:



47.     Typically, at the sector level, the general schedule pay scale for Chief Patrol Agent and Deputy Chief Patrol Officer are GS-15 or SES.

48.     Typically, at the sector level, the general schedule pay scale for Division Chiefs and Directors are GS-15 or GS-14.

49.     Specifically at the New Orleans Sector, there are three Division Chief positions – (1) Division Chief of Law Enforcement Operations; (2) Division Chief of Operational Programs; and (3) Division Chief of Operational Support.

50.     Further, each USBP sector is organizationally subdivided into "stations."

51.     Each station discharges local law enforcement operations of the surrounding territory.

52.     The chief decision-maker with respect to all agency and personnel decisions at the station-level is the Patrol Agent-in-Charge (PAIC).

53.     Typically, at the station level, the general schedule pay scale for PAIC's are GS-15, GS-14, or GS-13 (depending on the size of the station)

54.     During most of the relevant times in this case and also at present, Ms. Pedregon was permanently assigned as the Division Chief of Law Enforcement Operations, GS-14-1896, located

at New Orleans Sector headquarters in New Orleans, Louisiana.

**D.    USBP's Leadership Structure Appears to Be Segregated Based on Race, Sex, Color, and National Origin**

55.    Upon information and belief, and relevant to this case, a significant number of USBP agents are non-white and Hispanic.

56.    Upon information and belief, a significant number of USBP agents are women and people of color, specifically women who are non-white and Hispanic.

57.    Upon information and belief, USBP contains one national headquarters, twenty different sectors, and many stations, each with its own leadership structures.

58.    Upon information and belief, throughout the entire USBP, there is currently only one woman who is assigned to permanent positions at the Associate Chief or higher at the USBP headquarters.

59.    Upon information and belief, throughout the entire USBP, there is only one non-white or Hispanic agent who is assigned to a permanent position at the Associate Chief or higher level at the USBP headquarters.

60.    Upon information and belief, throughout the entire USBP, there is only female USBP agent assigned as an Acting or Permanent Chief Patrol Agent.

61.    Upon information and belief, throughout the entire USBP, there are statistically few non-white, Hispanic men who currently serve as Acting or Permanent Chief Patrol Agents.

62.    Upon information and belief, there are statically few women or people of color who occupy positions with general schedule pay scales of GS-15 or higher.

63.    Upon information and belief, there is, in effect, a virtual and statistically significant lack of any women or non-white and Hispanic USBP agents who occupy any senior leadership positions throughout the entirety of the United States Border Patrol, despite the fact that women

and non-white Hispanic USBP agents represent a significant, statistical composition of the total USBP workforce.

64.     Upon information and belief, for the reasons described above, the USBP is currently and de facto segregated based on sex, color, and national origin.

65.     Upon information and believe, USBP is organizationally segregated such that virtually or in fact only white, non-Hispanic, men occupy senior leadership positions throughout the entire organization.

66.     Upon information and belief, there is a de facto glass ceiling for women and non-white and Hispanic USBP agents at the GS-15 level – meaning, that upon information and belief, permanent promotion opportunities are simply denied to women and non-white and Hispanic USBP agents at the level of Chief Patrol Agent, Associate Chief, and above.

**E.     Ms. Pedregon Previously Serves as the Permanent Division Chief of Law Enforcement Operations, and as the Acting Deputy Chief Patrol Agent, of New Orleans Sector**

67.     Beginning in 2017, Ms. Pedregon was promoted and served as the permanent Division Chief of Law Enforcement Operations in New Orleans Sector, a GS-14 position.

68.     Prior to this position, Ms. Pedregon had been promoted to and successfully served in the following supervisory positions throughout USBP:

- Supervisory Border Patrol Agent

- Field Operations Supervisor

- Watch Commander

- Acting Deputy Patrol Agent in Charge

- Assistant Chief Patrol Agent

- Division Chief

13

- Acting Executive Officer

- Acting Deputy Chief Patrol Agent

- Acting Assistant Chief

69.    Throughout her career to this point, Ms. Pedregon had a record of exemplary service.

**F.    Ms. Pedregon Hits the Glass Ceiling**

70.    During 2017, the CPA of New Orleans Sector was John Richards (white, non-Hispanic).

71.    At this time, Ms. Pedregon served as the permanent Division Chief of Law Enforcement

Operations for the New Orleans Sector.

72.    During approximately April through September 2017, because of temporary personnel

openings, CPA Richards promoted Ms. Pedregon to the position of Acting Deputy Patrol Chief of

New Orleans Sector, where she successfully served.

73.    Later, CPA Richards retired, and the then-Deputy Chief Patrol Agent of New Orleans

Sector, Joseph Banco (white, non-Hispanic), became Acting Chief Patrol Agent for the sector.

74.    This personnel movement ultimately opened another vacancy for the New Orleans Sector

position of Acting Deputy Chief Patrol Agent.

75.    From approximately January through July 2018, CPA Banco temporarily promoted Ms.

Pedregon to the Acting Deputy CPA position where she successfully served.

76.    Shortly thereafter, USBP selected agent Gregory Bovino (white, non-Hispanic) to become

the new, permanent Chief Patrol Agent of New Orleans Sector.

77.    Once again, in January 2019, personnel changes again opened up the Deputy CPA position,

and Ms. Pedregon applied for and again won the position of Acting Deputy Chief Patrol Agent.

78.    However, upon information and belief, although unbeknownst to Ms. Pedregon at the time,

CPA Bovino harbors racial, sex, color, and national origin bias against his subordinates, and CPA

14

Bovino favors white, non-Hispanic men over all other demographics of agents.

79.     Likewise, at that time, the Chief of Law Enforcement Operations Directorate at USBP's Washington D.C. headquarters was agent Brian Hastings.

80.     Within USBP's national leadership structure, the Chief of Law Enforcement Operations Directorate is the immediate supervisor for all Chief Patrol Agents of all USBP sectors.

81.     Upon information and belief, Mr. Hastings harbors racial, sex, color, and national origin bias against his subordinates, and Chief Hastings favors white, non-Hispanic men over all other demographics of agents.

82.     On or about September 11, 2018, Ms. Pedregon applied via USAJobs.gov for an open "Associate Chief" position with USBP at its Washington, D.C. headquarters (job posting no. USBP-IMP-10288672-JRB).

83.     The Associate Chief position represents a promotion and senior-leadership advancement in an agent's career with USBP.

84.     Upon information and belief, at any one time, there are approximately 16 Associate Chiefs serving in USBP.

85.     Upon information and belief, historically within USBP, one customary path of career advancement often taken by USBP agents is transitioning from a Division Chief position that Ms. Pedregon encumbered at the time to an Associate Chief position; and, thereafter, transitioning through promotion from the Associate Chief position to either a permanent Chief Patrol Agent or Deputy Chief Patrol Agent position at a USBP sector headquarters.

86.     On November 30, 2018, despite her qualifications and experience, Ms. Pedregon learned that she had not been selected for the Associate Chief position.

87.     Instead, upon information and belief, two other applicants, R.S. and S.A. were selected

instead.[2]

88.     Upon information and belief, both R.S. and S.A. are white, non-Hispanic, men.

89.     Upon information and belief, Ms. Pedregon was demonstrably and objectively more qualified for the Associate Chief position than either R.S. and S.A.

90.     Further, Ms. Pedregon had previously supervised S.A. in her position as Division Chief of New Orleans Sector.

91.     Upon information and belief, the decision-maker with respect to this hiring decision was Chief Hastings.

92.     Upon information and belief, Chief Hastings, as is customary in senior-leadership promotion decisions, coordinated with Ms. Pedregon's Chief Patrol Agent with respect to the promotion decision, in this case CPA Bovino.

93.     Upon information and belief, Ms. Pedregon was not selected for the Associate Chief position because Chief Hastings and CPA Bovino favored R.S. and S.A. over Ms. Pedregon based on their sex, color, and national origin.

94.     Specifically, Bovino and Hastings preferred R.S. and S.A. over Ms. Pedregon because R.S. and S.A. are men, who are white and white in color, and who are not Hispanic.

95.     Specifically, upon information and belief, had Ms. Pedregon been a white, non-Hispanic, man, she would have been selected for the Associate Chief position.

96.     Alternatively, to the extent that Chief Hastings or CPA Bovino were not involved in the promotion decision, then whoever was the decision-maker with respect to the promotion decision held a disparate bias against Ms. Pedregon because of her sex, color, and national origin.

---

[2]  For privacy reasons, plaintiff uses initials for individual and federal employees when there is no direct allegation of discrimination against them.  Plaintiff will of course supplement the full identities all pseudonymized individuals to opposing counsel during discovery.

97.     Additionally or alternatively to the animus held by the decision-makers in this case, upon information and belief, USBP maintains either officially or in practice some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to senior-leadership positions over women and people of color, and this policy, custom, or practice had the effect of favoring R.S. and S.A. over Ms. Pedregon for the Associate Chief promotion.

**G.     Ms. Pedregon Initiates the EEO Process, Later Applies for Multiple Other Promotions, but Hits the Same Glass Ceiling and is Retaliated Against**

98.     On or about January 14, 2019, Ms. Pedregon timely initiated EEO contact regarding her claims of disparate treatment and disparate impact regarding her non-selection for the Associate Chief position.

99.     Ms. Pedregon timely filed her initial complaint of discrimination in this case on or about April 24, 2019.

100.    On March 8, 2019, after Ms. Pedregon first initiated EEO contact in January, Ms. Pedregon submitted an application for another promotion via USAjobs.gov for the position of Patrol Agent in Charge (GS-1896-14) at USBP's Three Points Station in Tucson, Arizona under job announcement USBP-IMP-10429075-HH.

101.    Ms. Pedregon was selected to interview the for the position on April 25, 2019.

102.    The day before her interview, Ms. Pedregon filed her initial complaint of discrimination in this case.

103.    Ms. Pedregon was interviewed by Division Chief Ronald Bellavia (white, non-Hispanic), PAIC Sabri Dickman (male, white, non-Hispanic), and PAIC Jack Jeffreys (white, non-Hispanic).

104.    Pedregon performed well in the interview and was selected for a second interview on May 3, 2019.

17

105.   The second interview was conducted by the Chief Patrol Agent for Tucson Sector, Roy Villareal (white, Hispanic).

106.   During this interview, CPA Villareal indicated to Ms. Pedregon that she was one of two applicants he was considering for the promotion, and that he would make his final decision that afternoon.

107.   Upon information and belief, CPA Villareal would have, and did in fact, contact either Chief Hastings at USBP headquarters or Ms. Pedregon's Sector CPA, Gregory Bovino (or both) prior to making his final determination.

108.   Upon information and belief, prior to contacting either Chief Hastings, CPA Bovino, or both, CPA Villareal had intended to select Ms. Pedregon for promotion.

109.   On or about June 11, 2019, Ms. Pedregon first learned via email notification that she had not been selected for the PAIC position.

110.   Ms. Pedregon contacted Tucson Sector headquarters to follow-up concerning her non-selection, and was informally advised that Pedregon had, in fact, been recommended for the promotion, but that USBP headquarters had intervened and did not concur in the selection, and so Ms. Pedregon was ultimately not selected for the promotion.

111.   Upon information and belief, Chief Hastings, either unilaterally or in conjunction with CPA Bovino, intervened in the matter and either directed or pressured CPA Villareal against selecting Ms. Pedregon based on her sex, color, and national origin (as previously alleged throughout this complaint).

112.   Alternatively, upon information and belief, USBP maintains either officially or in practice some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to

senior-leadership positions over women and people of color, and this policy, custom, or practice had the effect of disfavoring Ms. Pedregon's selection for promotion in this matter.

113.    Alternatively, upon information and belief, USBP decision-makers (whether Chief Hastings, CPA Bovino, or others) either directed or pressured CPA Villareal against selecting Ms. Pedregon for promotion in this matter in retaliation against her for filing her initial EEO complaint in this case.

**H.    CPA Bovino Unilaterally Demotes Ms. Pedregon at New Orleans Sector**

114.    Around the same time that Ms. Pedregon had applied for promotion to the PAIC position at Three Points Station in Tucson, Ms. Pedregon had also applied to the position of permanent Deputy Chief Patrol Agent at New Orleans Sector in New Orleans, LA, relevant to USAJobs.gov posting USBP-IMP-10386844-CJH.

115.    At the time of her application, Ms. Pedregon was successfully serving as the Acting Deputy Chief Patrol Agent at New Orleans Sector.

116.    Despite her many months of successful service as the Acting Deputy Chief Patrol Agent, CPA Bovino declined to interview Ms. Pedregon for the position.

117.    On May 27, 2019, Ms. Pedregon learned via email notification that she had not been selected for the position.

118.    Then, on July 18, 2019, shortly after Ms. Pedregon learned was not selected for promotion to the PAIC position at Three Points Station in Tucson, CPA Bovino announced via Sector-wide email that he had selected M.H. (white, non-Hispanic, male) for promotion to the DCPA position at New Orleans Sector.

119.    In that same email, CPA Bovino then unilaterally demoted Ms. Pedregon at New Orleans Sector from her position of permanent Division Chief of Law Enforcement Operations to the less-

senior and less-prestigious Division Chief of Operations Programs position.

120.    Although the Division Chief of Law Enforcement Operations and Division Chief of Operational Programs are designated with the same GS rank, throughout all of USBP Operational Programs is perceived as less senior and less prestigious than Law Enforcement Operations.

121.    In fact, at New Orleans Sector, to the extent that both the Chief Patrol Agent and Deputy Chief Patrol Agent are away on business or leave, the Division Chief of Law Enforcement Operations (not the Division Chief of Operations Programs) predominately and temporarily assumes decision-making authority as needed within the Sector.

122.    Ultimately, Ms. Pedregon's demotion from Division Chief of Law Enforcement Operations to Operational Programs meant a significant reduction in responsibility, supervision, and prestige, and promotion opportunity.

123.    CPA Bovino replaced Ms. Pedregon as Division Chief of Law Enforcement Operations with C.B. (white, non-Hispanic, male), who was previously hired to serve as the Division Chief of Operational Programs.

124.    Upon information and belief, Ms. Pedregon was objectively more qualified for the Deputy CPA position than M.H.

125.    Upon information and belief, Ms. Pedregon was objectively more qualified for the Division Chief of Law Enforcement Operations position than C.B.

126.    Upon information and belief, CPA Bovino, either unilaterally or in conjunction with Chief Hastings, did not select Ms. Pedregon for the Deputy Chief Patrol Agent position; and later demoted her to the position of Division Chief of Operational Programs, based on her sex, color, and national origin (as previously alleged throughout this complaint).

127.    Alternatively, upon information and belief, USBP maintains either officially or in practice

some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to senior-leadership positions over women and people of color, and this policy, custom, or practice had the effect of disfavoring Ms. Pedregon's selection for promotion in this matter; and, later, her demotion to the position of Division Chief of Law Enforcement Operational Programs.

128.    Alternatively, upon information and belief, USBP decision-makers, whether Chief Hastings, CPA Bovino, or others, ensured that Ms. Pedregon was not selected for her promotion to the Deputy CPA position; and, later, ensured that she was demoted from the Division Chief of Operations Division to Operational Programs, in retaliation against Ms. Pedregon for filing her initial EEO complaint in this case.

### I.    Ms. Pedregon Continues to Apply for Promotion and Is Routinely Not Selected

129.    Plaintiff incorporates here all prior allegations in this complaint.

130.    Even after her demotion to the Division Chief of Operational Programs position, Ms. Pedregon continued to apply to multiple promotions across USBP, including at its Washington D.C. headquarters and various Sectors.

131.    Until very recently, Ms. Pedregon was not selected for every single promotion or lateral assignment she applied for, despite the fact that she was objectively qualified for each position.

132.    Upon information and belief, Ms. Pedregon was not selected for these positions based on her sex, color, and national origin.

133.    Alternatively, upon information and belief, Ms. Pedregon was not selected for these positions based on some disparately impacting policy, custom, or practice within USBP that had the effect of favoring white, non-Hispanic, men over women and people of color.

134.    Alternatively, upon information and belief, Ms. Pedregon was not selected for these

positions in retaliation against her for filing her initial complaint of discrimination in this matter.

135.   The following is the list of promotions to which Ms. Pedregon applied but was subsequently not selected because of her sex, color, national origin; or because of similarly disparately impacting policy, custom, or policy within USBP; or in retaliation against her for filing her initial complaint of discrimination in this matter:

     a.     Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.

     b.     Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.

     c.     Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.

     d.     Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10532623-HH.

     e.     Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.

     f.     Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.

     g.     Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, applied for via lateral transfer (as opposed to a competitive posting via USAjobs.gov).

     h.     Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.

**J.** **USBP Finally Promotes Ms. Pedregon After Related Federal Lawsuits Are Filed Against USBP, Specifically Alleging the Same Pattern of Disparate Treatment and Retaliation Against CPA Bovino and Chief Hastings**

136. Around October 2019, in an effort to escape the continued and constant discriminatory work environment in New Orleans Sector, Ms. Pedregon applied for a less-senior position as a PAIC of Blythe Station in Blythe, California in USBP's Yuma Sector.

137. Upon information and belief, although the PAIC position is designated as a GS-14 position, the PAIC position is a constructive demotion in terms of supervisory responsibilities, leadership, and advancement potential from Ms. Pedregon's current position as Division Chief of Operational Programs.

138. Ms. Pedregon first learned that she had been selected for the lateral transition in December 2019.

139. Upon information and believe, two other USBP agents filed lawsuits against the agency alleging similar patterns of disparate treatment and retaliation, specifically including the alleged misconduct of CPA Bovino and Chief Hastings, in September and December 2019, prior to when Ms. Pedregon learned she been awarded her lateral transfer.

140. Likewise, since that time, upon information and belief, CPA Bovino is scheduled to transfer out of his position as Chief Patrol Agent of New Orleans Sector in the coming weeks or months.

141. Likewise, since that time, upon information and belief, Chief Hastings is scheduled to transfer out of his position of Chief of Law Enforcement Operations Directorate at USBP's headquarters in the coming weeks or months.

142. Upon information and belief, these personnel changes evince USBP's leadership's tacit admission that CPA Bovino, Chief Hastings, and USBP leadership were engaged in the disparate

treatment, disparate impact, and retaliatory conduct at New Orleans Sector and at USBP headquarters alleged within this lawsuit, and are now either attempting to correct or cover-up these problems by transferring away the culpable decision-makers.

## K.    The Aftermath

143.    Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon is out significant lost back and future wages attendant to the promotions for which she was not selected.

144.    Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon has suffered non-compensatory damages including for stress, loss of reputation, mental anguish, and loss of enjoyment of life.

145.    Specifically, because of the discriminatory and retaliatory environment in which Ms. Pedregon has been forced to work, she has endured significant stress, anxiety, and related mental anguish and loss of enjoyment of life.

146.    Further, to escape the discriminatory and retaliatory work environment in New Orleans Sector, Ms. Pedregon and her wife (also a USBP agent) transferred away.  Ms. Pedregon's wife successfully transferred to a USBP position at Sonoita Station in Tucson.  But because of the discriminatory and retaliatory non-selections in this case, Ms. Pedregon has been forced to transfer to California pending another available opportunity in Tucson.  At present, Ms. Pedregon and her wife's children will reside with Ms. Pedregon's spouse in the children's best interests in terms of proximity to other family, friends, and support networks located in Arizona.  Ms. Pedregon specifically claims loss of enjoyment of life attendant to her constructively forced separation from her children, wife, and family in this matter.

147.    Additionally, because of the discriminatory and retaliatory employment actions alleged

throughout this complaint, Ms. Pedregon is out future promotion opportunities and associated lost future wages attendant to her non-selections for promotion.

148.    Additionally, Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon has been forced to retain an attorney in this matter and has incurred reasonable attorney's fees and litigation costs.

## CAUSES OF ACTION

**A.    Unlawful Disparate Treatment and Disparate Impact Discrimination Based on Sex, Color, and National Origin under Title VII**

149.    Ms. Pedregon states a cause of action against defendant for unlawful disparate-treatment and disparate-impact discrimination based on her sex (female), color (brown), and national origin (Hispanic) concerning her non-selections for promotions and demotion as noted below:

    a.    Non-selection for promotion to Deputy Chief Patrol Agent, GS-1896-15, New Orleans, LA, advertised under Job Opportunity Announcement: USBP-IMP-10386844-CJH.

    b.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.

    c.    Demotion to Division Chief of Operational Programs at New Orleans Sector.

    d.    Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.

    e.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.

    f.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10532623-HH.

    g.    Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C.,

advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.

h.　　Non-selection for promotion to Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.

i.　　Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, applied for via lateral transfer (as opposed to a competitive posting via USAjobs.gov).

j.　　Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.

150.　Title VII of the Civil Rights Act of 1964 (as amended) forbids an employer from discriminating against any employee on account of the person's protected status.　42 U.S.C. §2000e-2(a)(1).　An employer illegally discharges an employee based on her protected status when that status is at least one of the factors motivating the discharge.　*Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (codifying that an employee proves unlawful discrimination when a protected status "was a motivating factor for any employment practice, even though other factors also motivated the practice").　When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir. 2004).　Alternatively, in a disparate impact claim, proof of discriminatory motive is not required.　*Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).　A prevailing plaintiff need only

prove that a policy, custom, or practice, even if factually neutral, has a disproportionately adverse effect on such a protected group.  *Id.*

151.    In either a disparate treatment or disparate impact case, "[s]tatistical evidence is also of central importance," and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown."  *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).  Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons."  *Id.*  "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence."  *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).  Likewise, in a disparate impact case, "[a] prima facie case is shown by identification of a neutral employment practice coupled with [statistical] proof of its discriminatory impact on the employer's work force."  *Pouncy*, 668 F.2d at 800.

152.    Finally, in a Title VII action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

153.    In this case, U.S. Customs and Border Protection, and its Office of United States Border Patrol, has a statistically apparent and historical pattern of denying promotion opportunities to women and people of color (specifically including those of Hispanic ethnicity) in favor of promoting predominantly white, non-Hispanic, men to the senior-most leadership positions at the sector-level, headquarters, and across the entire GS-15 pay scale.  Ms. Pedregon was a career-long,

exceptional performer who had been routinely promoted throughout the supervisory ranks of USBP during her career.  However, those promotions ended once Ms. Pedregon hit the "glass ceiling" of the GS-14 level, and Ms. Pedregon was denied promotion in this matter eight times in a row, and in fact was demoted from her position of Division Chief of Law Enforcement Operations to the position of Division Chief of Operational Programs.

154.    Upon information and belief, the personnel decisions of USBP, CPA Bovino, and Chief Hastings against Ms. Pedregon both in not selecting her for promotion and also for demoting her to the position of Division Chief of Operational Programs were specifically motivated by sex, color, and national origin animus against Ms. Pedregon.  Stated another way, had Ms. Pedregon been a white, non-Hispanic man, she would have been selected for each promotion alleged in this case and never demoted.

155.    Upon information and belief, at all times relevant here, the decisions of CPA Bovino, Chief Hastings, and perhaps other senior leadership officials at USBP headquarters were done purposefully, within the course and scope of their duties, and as agents of Customs and Border Protection.

156.    Alternatively, USBP had at all relevant times in this lawsuit some custom, policy, or practice that, although facially neutral, clearly had the disparate impact of almost universally denying senior promotion opportunities to women and people of color (including specifically brown and Hispanic people) at the Deputy Chief Patrol Agent and Associate Chief level and beyond, and more generally across the GS-15 pay scale.  In other words, had this policy, custom, or practice not existed, Ms. Pedregon would not have been disparately impacted, and she would have been selected for each promotion alleged in this case and never demoted.

157.    Accordingly, Customs and Border Protection and the United States Border Patrol is liable

for all actual and statutory damages suffered by Ms. Pedregon resulting from CBP and USBP's illegal and racially motivated employment actions and disparately impacting policies, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, loss of enjoyment of life, reasonable attorney's fees and costs incurred in this action; and, further, CBP is liable to reinstate Ms. Pedregon to the position of Associate Chief for which she was unlawfully not selected, or another position of identical or senior grade, so long as that reinstated position is not within the New Orleans Sector of USBP.

**B.      Unlawful Retaliation Under Title VII**

158.    Ms. Pedregon states a cause of action against defendant for unlawful retaliation concerning her multiple non-selections and demotion for the following positions:

a.      Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.

b.      Demotion to Division Chief of Operational Programs at New Orleans Sector.

c.      Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.

d.      Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.

e.      Non-selection for promotion to Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10532623-HH.

f.      Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.

g.      Non-selection for promotion to Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.

h.     Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, applied for via lateral transfer (as opposed to a competitive posting via USAjobs.gov).

i.     Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.

159.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a). In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989). A federal employer who violates Title VII is liable for the victim's back wages, front wages, reinstatement, statutory damages, attorney's fees, and litigation costs.

160.    Further, a plaintiff who alleges unlawful retaliation that grows out of a previously filed and exhausted EEO charge is not required to administratively exhaust the subsequent and related retaliation claim.  *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981) ("[W]e hold that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge"); *accord Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007) (recognizing applicability of the so-called "*Gupta* exception" in federal EEO cases).

161.    In this case, as alleged, Ms. Pedregon was an exceptional performer who, prior to her application for promotion to Associate Chief in 2018, had been routinely promoted and recognized within USBP.  However, once Ms. Pedregon filed her initial EEO charge in this matter, she was systematically rejected at least 7 times in a row for positions for which not only was Ms. Pedregon demonstrably qualified, but many of which were less senior in terms of leadership responsibility compared to positions Ms. Pedregon had previously held.  She was likewise demoted without cause or notice from her position as Division Chief of Law Enforcement Operations to the position of Division Chief of Operational Programs.  Upon information and belief, either CPA Bovino, Chief Hastings, or other officials at USBP's Washington D.C. headquarters intentionally retaliated against Ms. Pedregon because of her previously filed complaint in this case by ensuring that she was not selected for further promotion and in fact demoted.

162.    Accordingly, Customs and Border Protection and the United States Border Patrol are liable for all actual and statutory damages suffered by Ms. Pedregon resulting from CBP and USBP's illegal and retaliatory employment actions, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, and reasonable attorney's fees and costs incurred in this action; and, further, CBP is liable to reinstate Ms. Pedregon to the position of Associate Chief for which she was unlawfully not selected, or another position of identical or

senior grade, so long as that reinstated position is not within the New Orleans Sector of USBP.

## JURY DEMAND

Ms. Pedregon requests a trial by jury on all claims and causes of action asserted in this matter.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Teresa Pedregon prays that her complaint be deemed good and sufficient; that it and summons be served upon defendant Chad Wolf, solely in his official capacity as Acting Secretary of the United States Department of Homeland Security; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant for (1) all damages and equitable relief due to plaintiff, including compensatory damages, statutory damages, costs, attorney's fees, and legal interest from the date of demand; (2) an injunction ordering defendant to reinstate Ms. Pedregon to the most senior position within USBP for which Ms. Pedregon was unlawfully not selected or which equity otherwise requires; and (3) an injunction prohibiting defendant from engaging in all current and future race-based discrimination against women and people of color (including brown people and of Hispanic ethnicity) seeking promotion to senior leadership positions and more generally within the GS-15 pay grade, or higher general schedule pay grade, and to further enjoin defendant from engaging in unlawful retaliation against any employees for prior, protected EEO activity; and for all other general and equitable relief plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email:  vogeltanz@gmail.com

*Counsel for Teresa Pedregon*