**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **TERESA PEDREGON** | **CIVIL ACTION** |
| **VERSUS** | **NO:  20-512** |
| **CHAD WOLF, ACTING SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY** | **SECTION: "A" (4)** |

## SECOND AMENDED, RESTATED, AND SUPERSEDING COMPLAINT WITH CLASS ACTION ALLEGATIONS

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), plaintiff Teresa Pedregon hereby amends and restates her complaint as a matter of course, thereby superseding her first amended complaint, for the purpose of asserting additional class-wide allegations of unlawful discrimination pursuant to Fed. R. Civ. P. 23 *et seq.*  Specifically, this action is now brought in Ms. Pedregon's individual capacity and on behalf of the class defined below.

### INTRODUCTION

1.     The United States Border Patrol (USBP), an office within the Department of Homeland Security, Customs and Border Protection, has enacted a glass ceiling within its chain of command whereby almost no employees other than white, non-Hispanic men are ever promoted to leadership positions at USBP headquarters in Washington, D.C., and very few employees are ever promoted to senior leadership positions anywhere within USBP at the grade of GS-15 or above.

1a.     Specifically, USBP has for years engaged in systematic, agency-wide, disparate-treatment and disparate-impact discrimination against its Border Patrol Agents who are ethnically Hispanic, or who are persons of color by creating an environment of custom, de facto, and actual policy whereby white, non-Hispanic men are almost exclusively in charge of all senior leadership

1

promotional decisions, and those white, non-Hispanic men purposefully exclude Hispanic, or who are persons of color, agents from these senior positions, and do so without any negative consequence whatsoever.

2.    Upon information and belief, and by way of example, USBP's workforce consists of approximately 20,000 individuals.  Of these, only approximately 5% of USBP's border patrol agent workforce are women.  There are approximately 69 leadership positions within all of USBP at the grade of GS-15 or above, including 25 leadership positions assigned to USBP headquarters at Washington D.C. at the level of "Associate Chief" or above.  However, as of today, Ms. Pedregon is aware of only two agents who are women who occupy any of these senior leadership positions.

3.    Approximately 50% of USBP's border patrol agent workforce agents identify as ethnically Hispanic.  However, of the approximately 69 leadership positions at the level of GS-15 or above, Ms. Pedregon is aware of only one Hispanic agent assigned to USBP headquarters at the level of Associate Chief or above, and only nine other Hispanic agents who occupy any senior leadership position at the grade of GS-15 or above.

4.    USBP has known or should have known that its employment practices – including but not limited to its pay, promotion, discipline, demotion, evaluation and compensation practices – have an illegal disparate impact on Hispanic, or persons of color, employees.  USBP has failed to take adequate measures to rectify this disparate impact.

5.    In fact, on November 20, 2019, it was publicly reported in the Washington Examiner that the newly appointed, Acting Commissioner of CBP, Mark Morgan, indicated in a closed-door leadership meeting that there were "too many white male faces at the Border Patrol HQ."

6.    The systematic race, sex, color, and national origin discrimination described in this

Amended Complaint with Class Action Allegations has been and is continuing in nature.

7.    Ms. Pedregon seeks, on behalf of herself and the Class she seeks to represent, declaratory and injunctive relief; monetary damages provided under law; and attorneys' fees, costs and expenses to redress the Defendant's pervasive and discriminatory employment policies, practices, and procedures.

## THE PARTIES

8.    Plaintiff is Teresa Pedregon, a person of majority, domiciled in Louisiana at the time these claims arose.

9.    Defendant is Chad Wolf, solely in his official capacity, the Acting Secretary of the Department of Homeland Security ("DHS"), including its agency, United States Customs and Border Protection ("CBP") (*see* 6 U.S.C. § 112(a) establishing the Secretary of DHS as the head of the department *and also* 6 U.S.C. § 211(e) establishing U.S. CBP).

## JURISDICTION AND VENUE

10.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. § 2000e-2 *et seq*. (Title VII disparate treatment/impact); 42 U.S.C. § 2000e-3 *et seq*. (Title VII retaliation); and 42 U.S.C. § 2000e-16 (applicability of Title VII to federal employment) as more particularly set-out herein.

11.    The Court has personal jurisdiction over Mr. Wolf, in his official capacity and as the proper defendant representing the United States Department of Homeland Security (and its agency, U.S. Customs and Border Protection), because all of the unlawful employment practices alleged herein occurred in the state of Louisiana (or were directed towards an employee working in Louisiana) and give rise to the specific Title VII causes of action in this case, and thus Mr. Wolf, in his official capacity and as the proper defendant for DHS and CBP, has established minimum specific contacts

with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

12.     Venue for Ms. Pedregon's Title VII claim is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically New Orleans), or were directed against Ms. Pedregon who was working in this forum (specifically New Orleans), or alternatively because Ms. Pedregon would have continued to have been employed in her otherwise promoted position in this forum but for the discriminatory non-selection at issue in this case.

## PROCEDURAL AND STATUTORY ALLEGATIONS

13.     At all relevant times, CBP employed more than 500 employees.

14.     In December 2003, CBP hired Ms. Pedregon (female, brown color, Hispanic) as a United States Border Patrol agent.

15.     Ms. Pedregon has been continuously employed by CBP since that time and assigned to the Office of the United States Customs and Border Patrol ("USBP").

16.     On or about September 11, 2018, Ms. Pedregon timely applied for the position of Associate Chief at USBP Headquarters in Washington, D.C. via USAjobs.gov posting USBP-IMP-10288672-JRB.

17.     Ms. Pedregon first learned she was not selected for the position on November 30, 2018.

18.     Ms. Pedregon timely initiated EEO contact alleging sex, color, and national origin disparate treatment and disparate impact discrimination on or about January 14, 2019.

19.     Ms. Pedregon received her Notice of Right to File a charge of discrimination in this matter on or about April 10, 2019.

20.     Ms. Pedregon timely filed her initial Individual Complaint of Employment Discrimination in this matter on or about April 24, 2019 (Agency No. HS-CBP-00701-2019), alleging disparate treatment and impact based on her sex (female), color (brown), and national origin (Hispanic ethnicity).[2]

21.     Thereafter, Ms. Pedregon timely added the following like or related claims to her initial complaint as follows:

        a.      On May 17, 2019, Ms. Pedregon learned she was not selected for the position of Deputy Chief Patrol Agent, GS-1896-15, New Orleans, LA, advertised under Job Opportunity Announcement: USBP-IMP-10386844-CJH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

        b.      On June 11, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about July 25, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for

---

[2] Throughout this complaint, references are made to USBP employees and decision-makers who are "white and non-Hispanic" versus those who are "non-white and Hispanic."  This is done within the technical context of Title VII to distinguish a claim of discrimination based on race versus one based on ethnicity, color, and national origin.  To be clear, Ms. Pedregon considers her race to be white, although her skin is brown in color, while her ethnic national origin characteristic is Hispanic.  In a non-technical sense, the disparate treatment and impact ultimately complained of in this lawsuit, and throughout the underlying EEO proceeding, is that USBP favors men over women, and white or white-skinned employees over non-white (i.e., race) or non-white-skinned (i.e. color and national origin) employees.

engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

c.  On July 18, 2019, Ms. Pedregon was demoted as a result of being reassigned to the position of Division Chief of Operational Programs at New Orleans Sector.  Ms. Pedregon timely filed an amendment to her initial complaint on or about July 25, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

d.  On July 26, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.  Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

e.  On August 23, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.  Ms. Pedregon timely filed an amendment to her initial complaint on or about August 27, 2019 alleging disparate treatment based on her national origin, sex, color, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency

No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

f.      On September 3, 2019, Ms. Pedregon learned she was not selected for the position of Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP-10532623-HH. Ms. Pedregon timely filed an amendment to her initial complaint on or about October 18, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

g.      On October 1, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA. Ms. Pedregon timely filed an amendment to her initial complaint on or about October 18, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

h.      On October 15, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK. Ms. Pedregon timely filed an amendment to her initial complaint on or about November 29, 2019 alleging disparate treatment based on her national origin, sex, and color, and

7

disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USBP thereafter accepted that claim for investigation.

i.    On October 25, 2019, Ms. Pedregon learned that her request for a lateral transfer to the position of Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, was denied.  Ms. Pedregon timely filed an amendment to her initial complaint on or about November 29, 2019 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019), and USCBP thereafter accepted that claim for investigation.

j.    On December 9, 2019, Ms. Pedregon learned she was not selected for the position of Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.  Ms. Pedregon timely filed an amendment to her initial complaint on or about January 23, 2020 alleging disparate treatment based on her national origin, sex, and color, and disparate impact, and retaliation for engaging in the EEO process relative to her initial complaint in this matter (Agency No. HS-CBP-00701-2019).  Thereafter, USCBP declined to accept the amendment for investigation (but instead construed Ms. Pedregon's January 23 correspondence as initiating informal EEO contact regarding that claim).

22.    The date that Ms. Pedregon filed her initial charge of discrimination in this case was April 24, 2019.

23.    To date, CBP has not rendered a final decision in Ms. Pedregon's case.

8

24.     To date, CBP has not finished its investigation into Ms. Pedregon's initial complaint or any of her subsequent and accepted amendments.

25.     To date, Ms. Pedregon has at all times fully and reasonably cooperated with CBP's investigation into and potential resolution of her complaint and subsequent amendments as follows:

      a.     On or about April 24, 2019, Ms. Pedregon voluntarily submitted a signed, federal declaration setting out the specific facts and circumstances of the allegations in her initial complaint.

      b.     On August 5, 2019, Ms. Pedregon timely submitted full responses, under oath, to 38 interrogatories propounded by the EEO investigator assigned to investigate Ms. Pedregon's case.

      c.     On September 26, 2019, Ms. Pedregon voluntarily participated in an EEO refereed mediation with decision-makers from USBP to resolve the entirety of her initial complaint and all subsequent amendments.

      d.     The mediation was not successful, and the parties did not resolve their dispute.

      e.     On July 25, 2019; August 27, 2019; October 18, 2019; November 11, 2019; and January 23, 2020, Ms. Pedregon voluntarily submitted correspondence to CBP fully setting out the facts and circumstances of each of her subsequent and accepted amendments to her initial charge.

26.     Nevertheless, to the best of Ms. Pedregon's observations, it appears that CBP took no further steps investigating her claims from July 17, 2019 (when CBP propounded 38 interrogatories to Ms. Pedregon relating to the facts of her case, which Ms. Pedregon timely answered on August 5, 2019) until January 13, 2020 (when CBP tendered Ms. Pedregon an

additional 101 interrogatories in this matter relating to the facts and circumstances of her complaint previously and voluntarily submitted to CBP as described above).

27.    The total time during this period that it appears that CBP took no particular actions to the best of Ms. Pedregon's observation was 180 days.

28.    It has been more than 180 days since Ms. Pedregon filed her initial complaint of discrimination in this matter through the date of filing of this federal lawsuit.

29.    At present, Ms. Pedregon has no reasonable hope that CBP will finish its investigation into Ms. Pedregon's complaint in any reasonable time period.

30.    Since the filing of the initial Complaint, Ms. Pedregon was transferred away from her posting at USBP's New Orleans Sector in New Orleans, Louisiana.

31.    At present, Ms. Pedregon's understanding is that key witnesses currently assigned to USBP's New Orleans Sector in New Orleans, Louisiana have been or will be scheduled for re-assignment away from New Orleans.

32.    Despite Ms. Pedregon's full and voluntary cooperation with CBP during its attempts to investigate and resolve Ms. Pedregon's complaint, CBP has not yet finished its investigation or rendered a final agency decision in the matter.

33.    Ms. Pedregon has fully exhausted her administrative claims over each instance of discrimination and retaliation alleged throughout this lawsuit, and Ms. Pedregon desires to commence federal litigation in this matter to hopefully preserve relevant evidence in this case and while witness memories are still fresh.

34.    For all these reasons, Ms. Pedregon is aggrieved by CBP's failure to take final action on her complaint in this matter.

35.     Accordingly, pursuant to 42 USC § 2000e-16(c) and 29 CFR § 1614.407(b), Ms. Pedregon now files this federal complaint arising from her initial complaint and subsequent amendments in this matter.

## FACTS

### A.     The Plaintiff – Teresa Pedregon

36.     Teresa Pedregon is a 47-year-old woman, who is brown in color, and who is ethnically Hispanic.

37.     Ms. Pedregon is married to her spouse, who is also a USBP agent, although Ms. Pedregon and her wife are currently forced to live separate and apart on different assignments within the United States specifically because of the unlawful employment actions alleged in this lawsuit.

38.     Ms. Pedregon began her full-time career as a United States Border Patrol Agent in 2003.

39.     Through excellent work and dedication to service, Ms. Pedregon earned multiple promotions within the USBP and currently holds the permanent rank of Patrol Agent in Charge, GS-14-1896, assigned to USBP's Blythe Station, Yuma Sector, in Blythe, California.

a.     Immediately prior to this assignment, Ms. Pedregon held the permanent rank of Division Chief, GS-14-1896, assigned to USBP's New Orleans Sector headquarters located in New Orleans, Louisiana.

40.     At one time, through her hard work and dedication, Ms. Pedregon served as the acting Deputy Chief Patrol Agent of a USBP's New Orleans Sector.

### B.     The Employing Agency – U.S. Customs and Border Protection, Office of United States Border Patrol

42.     As a USBP agent, Ms. Pedregon is employed by United States Customs and Border Protection and assigned to its Office of the United States Border Patrol.

43.     CBP is a statutory agency of the United States Department of Homeland Security.

44.    USBP is a statutory office of the CBP.

45.    At all relevant times, CBP employed more than 500 employees.

46.    USBP's statutory mission is to serve as the law enforcement office of CBP, and to interdict persons illegally entering or exiting the United States; interdict illegally imported or exported goods at points other than ports of entry; and deter and prevent the entry of terrorists, terrorist weapons, and other contraband.

**C.    USBP's Organizational and Leadership Structure**

47.    USBP's national headquarters is located in Washington D.C.

48.    USBP is geographically organized into "sectors," and each sector often cover multiple U.S. states, large linear stretches of the United States international border, and very large sections of United States territory.

49.    Each sector maintains its own leadership and support staff which provide leadership, supervision, and mission support throughout the region.

50.    The chief decision-maker with respect to all agency and personnel decisions at the sector-level is the Chief Patrol Agent (CPA).

51.    The executive officer who assists the CPA is the Deputy Chief Patrol Agent (DCPA).

52.    Typically, leadership at the sector-level then consists of different divisions, such as "division of law enforcement operations," or "division of operational support," and is headed-up by a Supervisory Border Patrol Agent, often referred to as a "Division Chief."

53.    Thus, leadership and command structure at the sector-level, and specifically the New Orleans Sector, often looks like this:



54.     Typically, at the sector level, the general schedule pay scale for Chief Patrol Agent and Deputy Chief Patrol Officer are GS-15 or SES.

55.     Typically, at the sector level, the general schedule pay scale for Division Chiefs and Directors are GS-15 or GS-14.

56.     Specifically at the New Orleans Sector, there are three Division Chief positions – (1) Division Chief of Law Enforcement Operations; (2) Division Chief of Operational Programs; and (3) Division Chief of Operational Support.

57.     Further, each USBP sector is organizationally subdivided into "stations."

58.     Each station discharges local law enforcement operations of the surrounding territory.

59.     The chief decision-maker with respect to all agency and personnel decisions at the station-level is the Patrol Agent-in-Charge (PAIC).

60.     Typically, at the station level, the general schedule pay scale for PAIC's are GS-15, GS-14, or GS-13 (depending on the size of the station)

61.     During most of the relevant times in this case and also at present, Ms. Pedregon was permanently assigned as the Division Chief of Law Enforcement Operations, GS-14-1896, located at New Orleans Sector headquarters in New Orleans, Louisiana.

**D.     USBP's Leadership Structure Appears to Be Segregated Based on Race, Sex, Color, and National Origin**

62.     Upon information and belief, and relevant to this case, a significant number of USBP agents are non-white and Hispanic.

63.     Upon information and belief, a significant number of USBP agents are women and people of color, specifically women who are non-white and Hispanic.

64.     Upon information and belief, USBP contains one national headquarters, twenty different sectors, and many stations, each with its own leadership structures.

65.     Upon information and belief, throughout the entire USBP, there is currently only one woman who is assigned to permanent positions at the Associate Chief or higher at the USBP headquarters.

66.     Upon information and belief, throughout the entire USBP, there is only one non-white or Hispanic agent who is assigned to a permanent position at the Associate Chief or higher level at the USBP headquarters.

61.     Upon information and belief, throughout the entire USBP, there is only one female USBP agent assigned as an Acting or Permanent Chief Patrol Agent.

62.     Upon information and belief, throughout the entire USBP, there are statistically few non-white, Hispanic men who currently serve as Acting or Permanent Chief Patrol Agents.

63.     Upon information and belief, there are statically few Hispanic, or people of color, who occupy positions with general schedule pay scales of GS-15 or higher.

64.     Upon information and belief, there is, in effect, a virtual and statistically significant lack of any women or non-white and Hispanic USBP agents who occupy any senior leadership positions throughout the entirety of the United States Border Patrol, despite the fact that women and non-white Hispanic USBP agents represent a significant, statistical composition of the total USBP workforce.

65.     Upon information and belief, for the reasons described above, the USBP is currently and de facto segregated based on race, sex, color, and national origin.

66.    Upon information and believe, USBP is organizationally segregated such that virtually or in fact only white, non-Hispanic, men occupy senior leadership positions throughout the entire organization.

67.    Upon information and belief, there is a de facto glass ceiling for women and/or non-white and Hispanic USBP agents at the GS-15 level – meaning, that upon information and belief, permanent promotion opportunities are simply denied to women and non-white and Hispanic USCBP agents at the level of Chief Patrol Agent, Associate Chief, and above.

**E.    Ms. Pedregon Previously Serves as the Permanent Division Chief of Law Enforcement Operations, and as the Acting Deputy Chief Patrol Agent, of New Orleans Sector**

68.    Beginning in 2017, Ms. Pedregon was promoted and served as the permanent Division Chief of Law Enforcement Operations in New Orleans Sector, a GS-14 position.

69.    Prior to this position, Ms. Pedregon had been promoted to and successfully served in the following supervisory positions throughout USCBP:

- Supervisory Border Patrol Agent

- Field Operations Supervisor

- Watch Commander

- Acting Deputy Patrol Agent in Charge

- Assistant Chief Patrol Agent

- Division Chief

- Acting Executive Officer

- Acting Deputy Chief Patrol Agent

- Acting Assistant Chief

70.    Throughout her career to this point, Ms. Pedregon had a record of exemplary service.

**F.    Ms. Pedregon Hits the Glass Ceiling**

71.    During 2017, the CPA of New Orleans Sector was John Richards (white, non-Hispanic).

72.    At this time, Ms. Pedregon served as the permanent Division Chief of Law Enforcement Operations for the New Orleans Sector.

73.    During approximately April through September 2017, because of temporary personnel openings, CPA Richards promoted Ms. Pedregon to the position of Acting Deputy Patrol Chief of New Orleans Sector, where she successfully served.

74.    Later, CPA Richards retired, and the then-Deputy Chief Patrol Agent of New Orleans Sector, Joseph Banco (white, non-Hispanic), became Acting Chief Patrol Agent for the sector.

75.    This personnel movement ultimately opened another vacancy for the New Orleans Sector position of Acting Deputy Chief Patrol Agent.

76.    From approximately January through July 2018, CPA Banco temporarily promoted Ms. Pedregon to the Acting Deputy CPA position where she successfully served.

77.    Shortly thereafter, USBP selected agent Gregory Bovino (white, non-Hispanic) to become the new, permanent Chief Patrol Agent of New Orleans Sector.

78.    Once again, in January 2019, personnel changes again opened up the Deputy CPA position, and Ms. Pedregon applied for and again won the position of Acting Deputy Chief Patrol Agent.

79.    However, upon information and belief, although unbeknownst to Ms. Pedregon at the time, CPA Bovino harbors racial, sex, color, and national origin bias against his subordinates, and CPA Bovino favors white, non-Hispanic men over all other demographics of agents.

81.    Likewise, at that time, the Chief of Law Enforcement Operations Directorate at USCBP's Washington D.C. headquarters was agent Brian Hastings.

82.    Within USBP's national leadership structure, the Chief of Law Enforcement Operations

Directorate is the immediate supervisor for all Chief Patrol Agents of all USBP sectors.

83.     Upon information and belief, Mr. Hastings harbors racial, sex, color, and national origin bias against his subordinates, and Chief Hastings favors white, non-Hispanic men over all other demographics of agents.

84.     On or about September 11, 2018, Ms. Pedregon applied via USAJobs.gov for an open "Associate Chief" position with USBP at its Washington, D.C. headquarters (job posting no. USBP-IMP-10288672-JRB).

85.     The Associate Chief position represents a promotion and senior-leadership advancement in an agent's career with USBP.

86.     Upon information and belief, at any one time, there are approximately 16 Associate Chiefs serving in USBP.

87.     Upon information and belief, historically within USBP, one customary path of career advancement often taken by USBP agents is transitioning from a Division Chief position that Ms. Pedregon encumbered at the time to an Associate Chief position; and, thereafter, transitioning through promotion from the Associate Chief position to either a permanent Chief Patrol Agent or Deputy Chief Patrol Agent position at a USBP sector headquarters.

88.     On November 30, 2018, despite her qualifications and experience, Ms. Pedregon learned that she had not been selected for the Associate Chief position.

89.     Instead, upon information and belief, two other applicants, R.S. and S.A. were selected instead.[3]

90.     Upon information and belief, both R.S. and S.A. are white, non-Hispanic, men.

---

[3] For privacy reasons, plaintiff uses initials for individual and federal employees when there is no direct allegation of discrimination against them.  Plaintiff will of course supplement the full identities all pseudonymized individuals to opposing counsel during discovery.

91.     Upon information and belief, Ms. Pedregon was demonstrably and objectively more qualified for the Associate Chief position than either R.S. and S.A.

91.     Further, Ms. Pedregon had previously supervised S.A. in her position as Division Chief of New Orleans Sector.

92.     Upon information and belief, the decision-maker with respect to this hiring decision was Chief Hastings.

93.     Upon information and belief, Chief Hastings, as is customary in senior-leadership promotion decisions, coordinated with Ms. Pedregon's Chief Patrol Agent with respect to the promotion decision, in this case CPA Bovino.

94.     Upon information and belief, Ms. Pedregon was not selected for the Associate Chief position because Chief Hastings and CPA Bovino favored R.S. and S.A. over Ms. Pedregon based on their race, sex, color, and national origin.

95.     Specifically, Bovino and Hastings preferred R.S. and S.A. over Ms. Pedregon because R.S. and S.A. are men, who are white and white in color, and who are not Hispanic.

96.     Specifically, upon information and belief, had Ms. Pedregon been a white, non-Hispanic, man, she would have been selected for the Associate Chief position.

97.     Alternatively, to the extent that Chief Hastings or CPA Bovino were not involved in the promotion decision, then whoever was the decision-maker with respect to the promotion decision held a disparate bias against Ms. Pedregon because of her race, sex, color, and national origin.

98.     Additionally or alternatively to the animus held by the decision-makers in this case, upon information and belief, USBP maintains either officially or in practice some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to senior-leadership positions over

18

women and people of color, and this policy, custom, or practice had the effect of favoring R.S. and

S.A. over Ms. Pedregon for the Associate Chief promotion.

**G.    Ms. Pedregon Initiates the EEO Process, Later Applies for Multiple Other Promotions, but Hits the Same Glass Ceiling and is Retaliated Against**

99.    On or about January 14, 2019, Ms. Pedregon timely initiated EEO contact regarding her

claims of disparate treatment and disparate impact regarding her non-selection for the Associate

Chief position.

100.    Ms. Pedregon timely filed her initial complaint of discrimination in this case on or about

April 24, 2019.

101.    On March 8, 2019, after Ms. Pedregon first initiated EEO contact in January, Ms. Pedregon

submitted an application for another promotion via USAjobs.gov for the position of Patrol Agent

in Charge (GS-1896-14) at USBP's Three Points Station in Tucson, Arizona under job

announcement USBP-IMP-10429075-HH.

102.    Ms. Pedregon was selected to interview the for the position on April 25, 2019.

103.    The day before her interview, Ms. Pedregon filed her initial complaint of discrimination in

this case.

104.    Ms. Pedregon was interviewed by Division Chief Ronald Bellavia (white, non-Hispanic),

PAIC Sabri Dickman (male, white, non-Hispanic), and PAIC Jack Jeffreys (white, non-Hispanic).

105.    Pedregon performed well in the interview and was selected for a second interview on May

3, 2019.

106.    The second interview was conducted by the Chief Patrol Agent for Tucson Sector, Roy

Villareal (white, Hispanic).

107.    During this interview, CPA Villareal indicated to Ms. Pedregon that she was one of two

applicants he was considering for the promotion, and that he would make his final decision that

afternoon.

108.    Upon information and belief, CPA Villareal would have, and did in fact, contact either Chief Hastings at USBP headquarters or Ms. Pedregon's Sector CPA, Gregory Bovino (or both) prior to making his final determination.

109.    Upon information and belief, prior to contacting either Chief Hastings, CPA Bovino, or both, CPA Villareal had intended to select Ms. Pedregon for promotion.

110.    On or about June 11, 2019, Ms. Pedregon first learned via email notification that she had not been selected for the PAIC position.

111.    Ms. Pedregon contacted Tucson Sector headquarters to follow-up concerning her non-selection, and was informally advised that Pedregon had, in fact, been recommended for the promotion, but that USBP headquarters had intervened and did not concur in the selection, and so Ms. Pedregon was ultimately not selected for the promotion.

112.    Upon information and belief, Chief Hastings, either unilaterally or in conjunction with CPA Bovino, intervened in the matter and either directed or pressured CPA Villareal against selecting Ms. Pedregon based on her race, sex, color, and national origin (as previously alleged throughout this complaint).

113.    Alternatively, upon information and belief, USBP maintains either officially or in practice some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to senior-leadership positions over women and people of color, and this policy, custom, or practice had the effect of disfavoring Ms. Pedregon's selection for promotion in this matter.

114.    Alternatively, upon information and belief, USBP decision-makers (whether Chief Hastings, CPA Bovino, or others) either directed or pressured CPA Villareal against selecting Ms.

Pedregon for promotion in this matter in retaliation against her for filing her initial EEO complaint in this case.

**H.    CPA Bovino Unilaterally Demotes Ms. Pedregon at New Orleans Sector**

115.    Around the same time that Ms. Pedregon had applied for promotion to the PAIC position at Three Points Station in Tucson, Ms. Pedregon had also applied to the position of permanent Deputy Chief Patrol Agent at New Orleans Sector in New Orleans, LA, relevant to USAJobs.gov posting USBP-IMP-10386844-CJH.

116.    At the time of her application, Ms. Pedregon was successfully serving as the Acting Deputy Chief Patrol Agent at New Orleans Sector.

117.    Despite her many months of successful service as the Acting Deputy Chief Patrol Agent, CPA Bovino declined to interview Ms. Pedregon for the position.

118.    On May 27, 2019, Ms. Pedregon learned via email notification that she had not been selected for the position.

119.    Then, on July 18, 2019, shortly after Ms. Pedregon learned was not selected for promotion to the PAIC position at Three Points Station in Tucson, CPA Bovino announced via Sector-wide email that he had selected M.H. (white, non-Hispanic, male) for promotion to the DCPA position at New Orleans Sector.

120.    In that same email, CPA Bovino then unilaterally demoted Ms. Pedregon at New Orleans Sector from her position of permanent Division Chief of Law Enforcement Operations to the less-senior and less-prestigious Division Chief of Operations Programs position.

121.    Although the Division Chief of Law Enforcement Operations and Division Chief of Operational Programs are designated with the same GS rank, throughout all of USBP Operational Programs is perceived as less senior and less prestigious than Law Enforcement Operations.

122.    In fact, at New Orleans Sector, to the extent that both the Chief Patrol Agent and Deputy Chief Patrol Agent are away on business or leave, the Division Chief of Law Enforcement Operations (not the Division Chief of Operations Programs) predominately and temporarily assumes decision-making authority as needed within the Sector.

123.    Ultimately, Ms. Pedregon's demotion from Division Chief of Law Enforcement Operations to Operational Programs meant a significant reduction in responsibility, supervision, and prestige, and promotion opportunity.

124.    CPA Bovino replaced Ms. Pedregon as Division Chief of Law Enforcement Operations with C.B. (white, non-Hispanic, male), who was previously hired to serve as the Division Chief of Operational Programs.

125.    Upon information and belief, Ms. Pedregon was objectively more qualified for the Deputy CPA position than M.H.

126.    Upon information and belief, Ms. Pedregon was objectively more qualified for the Division Chief of Law Enforcement Operations position than C.B.

127.    Upon information and belief, CPA Bovino, either unilaterally or in conjunction with Chief Hastings, did not select Ms. Pedregon for the Deputy Chief Patrol Agent position; and later demoted her to the position of Division Chief of Operational Programs, based on her race, sex, color, and national origin (as previously alleged throughout this complaint).

128.    Alternatively, upon information and belief, USBP maintains either officially or in practice some policy, custom, or practice that, although perhaps facially neutral, has the disparately impacting effect that white, non-Hispanic men are disproportionately favored and promoted to senior-leadership positions over women and people of color, and this policy, custom, or practice had the effect of disfavoring Ms. Pedregon's selection for promotion in this matter; and, later, her

demotion to the position of Division Chief of Law Enforcement Operational Programs.

129.    Alternatively, upon information and belief, USBP decision-makers, whether Chief Hastings, CPA Bovino, or others, ensured that Ms. Pedregon was not selected for her promotion to the Deputy CPA position; and, later, ensured that she was demoted from the Division Chief of Operations Division to Operational Programs, in retaliation against Ms. Pedregon for filing her initial EEO complaint in this case.

I.    **Ms. Pedregon Continues to Apply for Promotion and Is Routinely Not Selected**

130.    Plaintiff incorporates here all prior allegations in this complaint.

131.    Even after her demotion to the Division Chief of Operational Programs position, Ms. Pedregon continued to apply to multiple promotions across USBP, including at its Washington D.C. headquarters and various Sectors.

132.    Until very recently, Ms. Pedregon was not selected for every single promotion or lateral assignment she applied for, despite the fact that she was objectively qualified for each position.

133.    Upon information and belief, Ms. Pedregon was not selected for these positions based on her race, sex, color, and national origin.

134.    Alternatively, upon information and belief, Ms. Pedregon was not selected for these positions based on some disparately impacting policy, custom, or practice within USBP that had the effect of favoring white, non-Hispanic, men over women and people of color.

135.    Alternatively, upon information and belief, Ms. Pedregon was not selected for these positions in retaliation against her for filing her initial complaint of discrimination in this matter.

136.    The following is the list of promotions to which Ms. Pedregon applied but was subsequently not selected because of her race, sex, color, national origin; or because of similarly disparately impacting policy, custom, or policy within USBP; or in retaliation against her for filing

her initial complaint of discrimination in this matter:

a.  Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.

b.  Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.

c.  Patrol Agent in Charge, GS-1896-14, Wilcox, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.

d.  Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10532623-HH.

e.  Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.

f.  Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.

g.  Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, applied for via lateral transfer (as opposed to a competitive posting via USAjobs.gov).

h.  Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.

**J.  USBP Laterally Transfers Ms. Pedregon After Related Federal Lawsuits Are Filed Against USBP, Specifically Alleging the Same Pattern of Disparate Treatment and Retaliation Against CPA Bovino and Chief Hastings**

137.  Around October 2019, in an effort to escape the continued and constant discriminatory work environment in New Orleans Sector, Ms. Pedregon applied for a less-senior position as a PAIC of Blythe Station in Blythe, California in USBP's Yuma Sector.

138.  Upon information and belief, although the PAIC position is designated as a GS-14 position,

the PAIC position is a constructive demotion in terms of supervisory responsibilities, leadership, and advancement potential from Ms. Pedregon's current position as Division Chief of Operational Programs.

139.    Ms. Pedregon first learned that she had been selected for the lateral transition in December 2019.

140.    Upon information and believe, two other USBP agents filed lawsuits against the agency alleging similar patterns of disparate treatment and retaliation, specifically including the alleged misconduct of CPA Bovino and Chief Hastings, in September and December 2019, prior to when Ms. Pedregon learned she been awarded her lateral transfer.

141.    Likewise, since that time, upon information and belief, CPA Bovino has now been transfered out of his position as Chief Patrol Agent of New Orleans Sector and has been promoted to the SES level as the Chief Patrol Agent of the El Centro Sector.

142.    Likewise, since that time, upon information and belief, Chief Hastings has been transferred out of his position of Chief of Law Enforcement Operations Directorate at USBP's headquarters and is the Chief Patrol Agent of the Rio Grande Valley Sector.

143.    Upon information and belief, these personnel changes evince USBP's leadership's tacit admission that CPA Bovino, Chief Hastings, and USBP leadership were engaged in the disparate treatment, disparate impact, and retaliatory conduct at New Orleans Sector and at USBP headquarters alleged within this lawsuit, and are now either attempting to correct or cover-up these problems by transferring away the culpable decision-makers.

**K.    The Aftermath**

144.    Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon is out significant lost back and future wages attendant to the promotions

25

for which she was not selected.

145.    Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon has suffered non-compensatory damages including for stress, loss of reputation, mental anguish, and loss of enjoyment of life.

146.    Specifically, because of the discriminatory and retaliatory environment in which Ms. Pedregon has been forced to work, she has endured significant stress, anxiety, and related mental anguish and loss of enjoyment of life.

147.    Further, to escape the discriminatory and retaliatory work environment in New Orleans Sector, Ms. Pedregon and her wife (also a USBP agent) transferred away.  Ms. Pedregon's wife successfully transferred to a USBP position at Sonoita Station in Tucson.  But because of the discriminatory and retaliatory non-selections in this case, Ms. Pedregon has been forced to transfer to California pending another available opportunity in Tucson.  At present, Ms. Pedregon and her wife's children will reside with Ms. Pedregon's spouse in the children's best interests in terms of proximity to other family, friends, and support networks located in Arizona.  Ms. Pedregon specifically claims loss of enjoyment of life attendant to her constructively forced separation from her children, wife, and family in this matter.

148.    Additionally, because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon is out future promotion opportunities and associated lost future wages attendant to her non-selections for promotion.

149.    Additionally, Because of the discriminatory and retaliatory employment actions alleged throughout this complaint, Ms. Pedregon has been forced to retain an attorney in this matter and has incurred reasonable attorney's fees and litigation costs.

## CLASS ALLEGATIONS

150.    Ms. Pedregon brings this Class Action pursuant Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory and monetary relief for USBP's pattern and practice of gender and racial discrimination through its employment with Defendant.

151.    As described above, USBP's compensation, performance review, merit increase, and promotion policies and practices represent a pattern or practice of intentional discrimination against all women, ethnically Hispanic agents, or agents who are not white.

152.    As described above, USBP's compensation, performance review, merit increase, and promotion policies and practices have a disproportionate adverse impact on all women, ethnically Hispanic agents, or agents who are not white.

153.    USBP's discriminatory employment policies, practices and procedures described here and to which Ms. Pedregon and the Class members are subject, are established at USBP's highest management levels.

154.    USBP's discriminatory employment policies, practices and procedures were not uniquely experienced by Ms. Pedregon, but rather cause discrimination against women, Hispanic agents, and agents of color across USBP and appear to be USBP's standard operating procedure.

155.    Because of USBP's pattern and practice of discrimination against women, Hispanic agents, and agents of color, Ms. Pedregon and members of the proposed Class have suffered harm, including lost  back wages, lost promotional opportunity, lost future wages, lost future pension income, and employment benefits.

156.    Ms. Pedregon and the Class members have no plain, adequate, or complete remedy at law to redress, and this suit is their only means of securing adequate equitable relief from USBP's continuing pattern and practice of discrimination against them as alleged here.  Ms. Pedregon

and the Class members are now suffering irreparable injury from USBP's unlawful policies, practices, and procedures alleged here, and will continue to suffer unless those policies, practices and procedures are enjoined by this Court.

**A.    Class Definition**

157.    The proposed Rule 23 Title VII Race, Sex, Color, and National Origin Class is defined as: All women, ethnically Hispanic agents, or agents who are not white, who are, have been, or will be employed by United States Customs and Border Protection and assigned to the United States Border Patrol from 2015 to the date of judgment.  Here, "agents" is defined those employed by Customs and Border Protection and assigned to United States Border Patrol as a Border Patrol Agent with the grade of GS-14 or higher.

158.    Ms. Pedregon is a member of the Class she seeks to represent.

159.    Ms. Pedregon reserves the right to amend the Class definition in a separate motion for class certification or otherwise based on information obtained in discovery or legal developments.

**B.    Efficiency of Class Prosecution of Common Class**

160.    Certification of a class of women, Hispanic agents, and agents who are not white is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of Ms. Pedregon and the proposed Class.

161.    The individual claims of Ms. Pedregon require resolution of the common questions to determine whether USBP engaged in a systematic pattern and practice of discrimination against women, Hispanic agents, and agents of color.  Ms. Pedregon seeks remedies to eliminate the adverse effects of such discrimination in her own life, career, and working conditions, to eliminate the adverse effects of race, sex, color, and national origin discrimination in the lives, careers, and working conditions of the proposed class members, and to prevent continued race, sex, color, and

national origin discrimination in the future.

162.    Ms. Pedregon has standing to seek such relief because she has been adversely affected by the discriminatory policies and practices alleged.  USBP caused Ms. Pedregon's injuries through its discriminatory practices, policies, and procedures, and disparate treatment of employees who are women, who are ethnically Hispanic, or who are of color and not white.  The injuries USBP's discriminatory policies and practices have caused and will cause are redressable through systemic relief, including an injunction, and other appropriate class-wide and individual remedies sought in this action.

163.    To obtain relief for herself and the Class members, Ms. Pedregon will first establish the existence of systemic race, sex, color, and national origin discrimination as the premise for the relief she seeks.  Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

**C.    Numerosity and Impracticability of Joinder**

164.    The Class that Ms. Pedregon seeks to represent is so numerous that joinder of all members is impracticable.  Upon information and belief, the members of the proposed Class would be in the thousands.

165.    Additionally, USBP's pattern and practice of discrimination makes joinder impracticable by discouraging women, Hispanic agents, or agents of color who are not white from applying for or pursuing promotional opportunities, thereby making it impractical and inefficient to identify many members of the class prior to the determination of the merits of the USBP's class-wide liability.

**D.    Common Questions of Law and Fact**

29

166.    The prosecution of the claims of Ms. Pedregon will require the adjudication of numerous questions of law and fact common to the Class.

167.    The common issues of law and fact are, *inter alia*:

a.    Whether USBP's policy or practice of promotions to upper leadership positions disproportionately disqualifies, disadvantages, discourages or deters women and/or Hispanic agents from seeking and obtaining promotions and disproportionately prevents women, Hispanic agents, and agents of color from being considered and their qualifications fairly compared for promotions and, if so, whether there are alternative means available to USBP that have less adverse impact and achieve the same organizational ends.

b.    Whether USBP's policies and practices demonstrate a reckless disregard or deliberate indifference to its women and Hispanic agents by failing to address, prevent or remedy impermissible discrimination throughout USBP, of which it has long been aware.

c.    Whether USBP administers its policies and practices in a manner that has a disproportionate adverse effect on women and Hispanic agents and perpetuates discrimination against them, fails effectively to inform or train USBP decision-makers about, to have adequate incentives to prevent, to impose consequences for, and to receive, investigate and remedy impermissible discrimination; and whether USBP's policies and practices fail to provide compliance measures, a meaningful compliant and investigation process, meaningful standards, implementation metrics, quality control measures, or means for addressing impermissible discrimination.

c.    Whether USBP's policies and practices that discriminate against women and/or Hispanic agents are long-standing, have been administered and operated in substantially the same manner or with the same effects from the time Ms. Pedregon and members of the Class have been

employed by USBP, and represent a continuing violation of Title VII of the Civil Rights Act of 1964 or other federal law.

**E.    Typicality of Claims and Relief Sought**

168.    Ms. Pedregon's claims are typical of the claims of the proposed Class.  Ms. Pedregon asserts each of the types of claims she asserts on behalf of the proposed Class.  The relief she seeks for herself is also typical of the relief sough ton behalf of the proposed Class.

169.    Like the members of the proposed Class, Ms. Pedregon is an ethnically Hispanic woman with brown skin who has been employed by Customs and Border Protection and assigned to United States Border Patrol as a Border Patrol Agent during the liability period.

170.    USBP's pattern and practice of discrimination against women, Hispanic agents, and agents of color is accomplished through organization-wide customs, practices, or policies regarding compensation, performance review, merit increase, and promotion. Such discrimination applies to all agents and thus affects Ms. Pedregon and members of the Class in the same or similar ways.

171.    The relief necessary to remedy the claims of Ms. Pedregon is the same as that necessary to remedy the claims of the proposed class members.

**F.    Adequacy of Representation**

172.    Ms. Pedregon's interests are coextensive with those of the members of the proposed Class.

173.    Ms. Pedregon is willing and able to represent the proposed class fairly and vigorously.

174.    Ms. Pedregon has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and financial demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of Ms. Pedregon and her counsel to litigate competently the class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure

23(a)(4).

**G.    Requirements of Rule 23(b)(1)**

a.       The essence of Ms. Pedregon's individual claims in this lawsuit of race, sex, color, and national origin discrimination, as well as those identical claims of other individual, USBP agents, are essentially the same: that USBP's upper echelon of leadership at the Headquarters and the Sector level is dominated by the same group of mostly white, non-Hispanic men; that USBP's customs and policies regarding the process by which agents apply for and are selected for promotion are structurally flawed such that there is no meaningfully objective or merit-based assessment of qualifications during the promotion process; and, accordingly, that this small group of white, non-Hispanic men are able to consistently discriminate against all agents who are not white, non-Hispanic men – and in particular against agents who are women, ethnically Hispanic, or of color – such that virtually no one is able to obtain promotion to leadership positions at USBP headquarters, and very few are able to obtain promotion to leadership positions elsewhere at the **GS**-15 level or above, unless that agent is a white, non-Hispanic man.

a.       These claims involve the same decision-makers at USBP, the same customs and policies regarding the process of application and selection for promotion; and the same basis of discriminatory preference towards white, non-Hispanic men and against all others.

a.       Necessarily, for any agent who was denied promotion to the level of GS-15 or above, the adjudication of any other agent's lawsuit on these same questions of fact would be dispositive to the claims by all other agents and would substantially impair or impede their ability to protect their interests.

a.       Likewise, to the extent that some agents were to win their claims against USBP across different courts, it is likely if not guaranteed that USBP would be required to implement different

remedial measures that would result in USBP being forced to operate under incompatible standards of conduct.

a.      Accordingly, class certification is appropriate to protect both the interest of Ms. Pedregon and the class members in this matter as well as USBP.

**G.      Requirements of Rule 23(b)(2)**

175.    USBP has acted or refused to act on grounds generally applicable to Ms. Pedregon and the proposed Class, specifically that USBP has maintained customs and policies for the application and selection of agents for promotion that is identical between Ms. Pedregon and the class members, and that because of those customs and policies USBP leadership has purposefully and consistently failed to promote women and Hispanic agents to leadership positions at Headquarters or throughout USBP at the GS-15 level or above.

176.    For the same reasons, USBP has acted on grounds generally applicable to Ms. Pedregon and the proposed Class through the organization-wide policies and practices alleged here.

177.    USBP's systemic pattern and practice of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

178.    Injunctive and declaratory relief are the predominant relief sought in this case, and flows directly from the proof of systemic pattern or practice race, sex, color, and national origin discrimination by USBP.  In turn, entitlement to declaratory and injunctive relief provides a factual and legal predicate for recovery by Ms. Pedregon and Class members of monetary and nonmonetary remedies for losses caused by the systemic discrimination.

**H.      Requirements of Rule 23(b)(3)**

179.    The common issues of fact and law affecting the claims of Ms. Pedregon and proposed

Class Members – including, but not limited to, the common issues identified above – predominate over any issues affecting only individual claims because they can be decided on class-wide evidence and dispose of important issues appropriate to the claims of the Class as a whole.

180.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of Ms. Pedregon and members of the proposed Class.  The high cost of proving USBP's pattern and practice of discrimination in the context of a typical Title VII litigation makes it impracticable for Ms. Pedregon and members of the proposed Class to pursue their claims individually.

181.    The bifurcated method of determining pattern or practice claims provides an established, efficient and manageable means of determining both liability to the Class as a whole and class-wide relief, and to individual class members, including their entitlement to monetary remedies for losses caused by the systemic discrimination and other appropriate individual relief.

**I.    Requirements of Rule 23(c)(4)**

182.    This action may be certified as a class pursuant to Rule 23(c)(4) because the class issues apply to all class members and to all the USBP's locations nationwide.

183.    Ms. Pedregon alternatively seeks to maintain this action as a class pursuant to 23(c)(4), seeking partial certification of the common questions of law and fact.

<strong>COUNT I</strong>

**A.    Unlawful Disparate Treatment and Disparate Impact Discrimination Based on Race, Sex, Color, and National Origin under Title VII (On Behalf of Plaintiff and the Class Against Defendant)**

184.    Ms. Pedregon re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

185.    This Count is brought on behalf of Ms. Pedregon and all members of the Class.

34

186.    Defendant has discriminated against Ms. Pedregon and all members of the Class through unlawful disparate-treatment and disparate-impact discrimination based on sex (female), color (brown), and national origin (Hispanic) concerning the non-selections for promotions and demotion.

187.    Title VII of the Civil Rights Act of 1964 (as amended) forbids an employer from discriminating against any employee on account of the person's protected status.  42 U.S.C. §2000e-2(a)(1).  An employer illegally discharges an employee based on her protected status when that status is at least one of the factors motivating the discharge.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *cf* 42 U.S.C. § 2000e–2(m) (codifying that an employee proves unlawful discrimination when a protected status "was a motivating factor for any employment practice, even though other factors also motivated the practice").  When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir. 2004).  Alternatively, in a disparate impact claim, proof of discriminatory motive is not required.  *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).  A prevailing plaintiff need only prove that a policy, custom, or practice, even if factually neutral, has a disproportionately adverse effect on such a protected group.  *Id.*

188.    In either a disparate treatment or disparate impact case, "[s]tatistical evidence is also of central importance," and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown." *Pouncy v.*

*Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982). Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.* "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994). Likewise, in a disparate impact case, "[a] prima facie case is shown by identification of a neutral employment practice coupled with [statistical] proof of its discriminatory impact on the employer's work force." *Pouncy*, 668 F.2d at 800.

189.  Finally, in a Title VII action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

190.  In this case, U.S. Customs and Border Protection, and its Office of United States Border Patrol, has a statistically apparent and historical pattern of denying promotion opportunities to women and/or Hispanics in favor of promoting predominantly white, non-Hispanic, men to the senior-most leadership positions at the sector-level, headquarters, and across the entire GS-15 pay scale. Ms. Pedregon was a career-long, exceptional performer who had been routinely promoted throughout the supervisory ranks of USBP during her career. However, those promotions ended once Ms. Pedregon hit the "glass ceiling" of the GS-14 level, and Ms. Pedregon was denied promotion in this matter eight times in a row, and in fact was demoted from her position of Division Chief of Law Enforcement Operations to the position of Division Chief of Operational Programs.

191.  Upon information and belief, the personnel decisions of the USBP against Ms. Pedregon

both in not selecting her for promotion and also for demoting her to the position of Division Chief of Operational Programs were specifically motivated by race, sex, color, and national origin animus against Ms. Pedregon. Stated another way, had Ms. Pedregon been a white, non-Hispanic man, she would have been selected for each promotion alleged in this case and never demoted.

192. Upon information and belief, at all times relevant here, the decisions of the USBP's upper management were done purposefully, within the course and scope of their duties, and as agents of Customs and Border Protection.

193. Alternatively, USBP had at all relevant times in this lawsuit some custom, policy, or practice that, although facially neutral, clearly had the disparate impact of almost universally denying senior promotion opportunities to women and Hispanics at the Deputy Chief Patrol Agent and Associate Chief level and beyond, and more generally across the GS-15 pay scale. In other words, had this policy, custom, or practice not existed, Ms. Pedregon and the Class members would not have been disparately impacted, and she would have been selected for each promotion alleged in this case and never demoted.

194. USBP's policies, practices, and procedures have had a disparate impact on Ms. Pedregon and the Class members with respect to their compensation and position within USBP, as well as the related terms and conditions of employment. These policies, practices, and procedures are centralized and imposed by upper management at USBP and CBP.

196. USBP's promotional decisions and/or system includes centralized control that resulted in race, sex, color, and national origin stereotyping that causes disparate impact of promotional opportunities and compensation paid to female and/or Hispanic Agents. Ms. Pedregon and the Class members are aware, at this time, of no other criteria which causes such disparate impact other than race, sex, color, and national origin bias, subjectivity and stereotyping.

37

196.    By reason of the continuous nature of the USBP's discriminatory conduct, which persisted throughout the employment of Ms. Pedregon and the members of the Class, Ms. Pedregon and the class members are entitled to the application of the continuing violation doctrine to all violations alleged herein.

197.    Accordingly, Defendant is liable for all actual and statutory damages suffered by Ms. Pedregon and the members of the Class resulting from the USBP's illegal and status-motivated employment actions and disparately impacting policies, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, loss of enjoyment of life, reasonable attorney's fees and costs incurred in this action; and, further, USBP is liable to reinstate Ms. Pedregon and the members of the Class to the positions for which they were unlawfully not selected, or another position of identical or senior grade.

## COUNT II

**B.    Unlawful Retaliation Under Title VII (On behalf of Plaintiff and the Class Against Defendant)**

198.    Ms. Pedregon re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Amended Complaint as though fully set forth herein.

199.    Ms. Pedregon states a cause of action against defendant for unlawful retaliation concerning her multiple non-selections and demotion for the following positions:

      a.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Three Points, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10429075-HH.

      b.    Demotion to Division Chief of Operational Programs at New Orleans Sector.

      c.    Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10422166-XYA.

      d.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Wilcox, AZ,

advertised under Job Opportunity Announcement: USBP-IMP- 10510255-HH.

e.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-15, Tucson, AZ, advertised under Job Opportunity Announcement: USBP-IMP- 10532623-HH.

f.    Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10577328-XYA.

g.    Non-selection for promotion to Associate Chief, GS-1895-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP- 10551136-KJK.

h.    Non-selection for promotion to Patrol Agent in Charge, GS-1896-14, Sonoita, AZ, applied for via lateral transfer (as opposed to a competitive posting via USAjobs.gov).

i.    Non-selection for promotion to Associate Chief, GS-1896-15, Washington, D.C., advertised under Job Opportunity Announcement: USBP-IMP-1056239-XYA.

200.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a).  In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)).  "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188

(5th Cir. 1997)).  Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).  A federal employer who violates Title VII is liable for the victim's back wages, front wages, reinstatement, statutory damages, attorney's fees, and litigation costs.

201.    Further, a plaintiff who alleges unlawful retaliation that grows out of a previously filed and exhausted EEO charge is not required to administratively exhaust the subsequent and related retaliation claim.  *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981) ("[W]e hold that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge"); *accord Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007) (recognizing applicability of the so-called "*Gupta* exception" in federal EEO cases).

202.    In this case, as alleged, Ms. Pedregon was an exceptional performer who, prior to her application for promotion to Associate Chief in 2018, had been routinely promoted and recognized within USBP.  However, once Ms. Pedregon filed her initial EEO charge in this matter, she was systematically rejected at least 7 times in a row for positions for which not only was Ms. Pedregon demonstrably qualified, but many of which were less senior in terms of leadership responsibility compared to positions Ms. Pedregon had previously held.  She was likewise demoted without cause or notice from her position as Division Chief of Law Enforcement Operations to the position of Division Chief of Operational Programs.  Upon information and belief, either CPA Bovino, Chief Hastings, or other officials at USBP's Washington D.C. headquarters intentionally retaliated against Ms. Pedregon because of her previously filed complaint in this case by ensuring that she was not selected for further promotion and in fact demoted.

203.    Accordingly,  Defendant is liable for all actual and statutory damages suffered by Ms. Pedregon and the Class members, who were not selected for supervisory or senior non-supervisory positions, resulting from CBP and USBP's illegal and retaliatory employment actions, including, but limited to, back pay, front pay, compensatory damages, mental anguish damages, and reasonable attorney's fees and costs incurred in this action; and, further, Defendant is liable to reinstate Ms. Pedregon and the Class members to the supervisory position for which she and the Class members were unlawfully not selected, or another position of identical or senior grade.

## JURY DEMAND

Ms. Pedregon, on her own behalf and on behalf of the Class, requests a trial by jury on all claims and causes of action asserted in this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff Teresa Pedregon, on her own behalf and on behalf of the Class, prays that this Court:

A.    Certify this case as a class action under Federal Rules of Civil Procedure Rule 23(a), (b)(1), (b)(2), or (b)(3), or alternatively, under (c)(4), on behalf of the proposed Class; designate Ms. Pedregon as representative of the Class; and designate Ms. Pedregon's counsel of records as Class Counsel.

B.    Declare and adjudge that the Defendant's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Ms. Pedregon and the members of the Class under Title VII of the Civil Rights Act of 1964, as amended;

C.    Issue a permanent injunction against Defendant prohibiting Defendant from engaging in all current and future race, sex, color, and national origin discrimination against women, Hispanic agents, and agents of color seeking promotion to senior leadership positions and more generally

within the GS-15 pay grade, or higher general schedule pay grade;

D.      Order Defendant to initiate and implement programs that will: (i) provide equal employment opportunities for female and/or Hispanic Agents; and (ii) remedy the effects of Defendant's past and present unlawful practices and/or procedures;

E:      Order Defendant to establish a task force on equality and fairness to determine the effectiveness of the programs described above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described above;

F.      Order Defendant to adjust the wage rates and benefits for Ms. Pedregon and the class members to the level that they would be enjoying but for Defendant's discriminatory policies, practices, and procedures;

G.      Order Defendant to place or restore Ms. Pedregon and the class members into those jobs they would now be occupying but for Defendant's discriminatory policies, practices, and procedures;

H.      Order Defendant to pay any agent who is already retired, or to any other agent still employed as equity requires, sufficient money damages to compensate the agent for his or her lost, future, federal pension value attendant to his or her yearly salary that would have been higher but-for USBP's unlawful discrimination.

H.      Award statutory and compensatory to Ms. Pedregon and the Class members;

I.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Ms. Pedregon and the Class members;

J.      Award lost back wages, lost future wages, the value of lost fringe benefits, preferential

rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Ms. Pedregon and the class members to be determined at trial;

K.      To the extent the Court determines that Ms. Pedregon and the class members are entitled only to equitable relief, to order USBP to pay them surcharge to make Ms. Pedregon and the class members whole, including lost back wages, lost future wages, lost pension value, and lost fringe benefits as appropriate; and,

L.      Award any other appropriate equitable or legal relief to Ms. Pedregon and the Class members as the Court may deem just and proper.

Respectfully submitted:

*/s/ Ryan P. Monsour*

_____
Preston L. Hayes (Bar #29898)
Ryan P. Monsour (Bar #33286)
Barry W. Sartin (Bar #34075)
*HMS Law Firm*
3850 N. Causeway Blvd.
Suite 590
Metairie, LA 70002
Telephone:  (504) 356-0110
Facsimile:  (504) 356-0112

And

Kevin S. Vogeltanz, TA (Bar #32746)
*The Law Office of Kevin S. Vogeltanz, LLC*
823 Carroll Street, Suite A
Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704